**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES


       v.


JASON JOHNSON

No. 24 Crim. 131

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO SUPPRESS**

**PRELIMINARY STATEMENT**

On July 28, 2021, Mr. Johnson arrived at the airport in Aruba on his way home to the United States. While going through the U.S. Customs and Border Protection ("CBP") preclearance station in Aruba, Mr. Johnson was selected by officers for a baggage search. Officers directed Mr. Johnson to a secondary screening location. Upon searching Mr. Johnson's backpack, officers reported that they found multiple phones and pieces of paper. Having identified the items as phones and papers—rather than contraband—the warrantless search and seizure of Mr. Johnson and the property should have ended. It did not officers held Mr. Johnson at the secondary screening for an extended period of time. They read the papers. They interrogated him about his involvement in possible "fraud." Without receiving any *Miranda* warnings, Mr. Johnson responded. The officers then placed the phones and papers into a plastic bag and took them to be transported to the United States. He was detained again upon arrival, at which time he was finally Mirandized, and he made no further comments. After taking photographs of the phones and making photocopies of the

1

papers, officers ultimately returned the items several days later. Some two and a half years later, he was arrested in this case.

All of the evidence in this case—including the photographs and photocopies taken—as well as Mr. Johnson's statements, and evidence procured as a result of subsequent investigation, were fruits of an unlawful search and seizure of Mr. Johnson. The Fourth Amendment violations in this case warrant suppression of all evidence recovered in this case, as well as Mr. Johnson's statements. Additionally, Mr. Johnson's statements were made in violation of his Fifth Amendment rights, as they were made to CBP officers in response to custodial interrogation without waiving his *Miranda* rights; they must be suppressed for this independent reason as well.

## BACKGROUND[1]

### *The Aruba Stop*

On July 28, 2021, Mr. Johnson was flying back from a vacation in Aruba to his home in New York. *See* Perry Aff. Ex. A. There is a CBP preclearance station at the Queen Beatrix International Airport in Aruba, where CBP officers inspect travelers prior to boarding U.S.-bound flights. The preclearance station was right next to Mr. Johnson's boarding gate. While Mr. Johnson was in line to go through the metal detector at the preclearance station, CBP officers picked him out of the line for inspection. *See id*. Armed, uniformed customs agents ordered Mr. Johnson to proceed to a "secondary inspection area," where the officers searched Mr. Johnson's backpack. *See id*. In doing so, they found multiple cell phones, as well as multiple pieces of paper. *See id*. The armed officers proceeded to read the information on the papers they had seized, and repeatedly questioned Mr. Johnson about their contents. *See id*. The officers specifically asked Mr. Johnson

---

[1] The facts discussed in this memorandum are allegations from the charging documents and discovery materials, which Mr. Johnson includes for purposes of this motion only.

"what kind of fraud he was involved in." *Id*. According to the officers, Mr. Johnson initially responded with "shock that he would be asked." *Id*. Nevertheless, the officers "persisted" with their questioning. *Id*. Only following this further questioning, in which they asked increasingly detailed questions about "insurance fraud," did Mr. Johnson allegedly make a number of statements to the interrogating agents. *Id*. Nothing in any of the reports indicates that anything about the phones or papers themselves—prior to actual review of their contents—implicated their mere possession as unlawful. At no point during the Aruba Stop was Mr. Johnson ever read his *Miranda* rights. *See id.*

Eventually, the officers seized the phones and papers, placed them in a bag, and provided them to the pilot for transportation. *See id.* Mr. Johnson was thereafter permitted to board the plane. *See id.*

***The JFK Stop***

Later that day, upon Mr. Johnson's arrival in New York, he was immediately escorted by Homeland Security to a secondary area at the passport control station. *See* Perry Aff. Ex. B. The bag containing the phones and papers was then brought to the secondary area. *See id.* Only at that time was Mr. Johnson Mirandized for the first time. He declined to waive his *Miranda* rights and stated that he would not answer any questions without his attorney present. *See* Perry Aff. Ex. C. The officers thereafter terminated their questioning and released Mr. Johnson. Though the officers released Mr. Johnson, they kept the phones and papers, photocopying them before releasing them to his attorney twelve days later. *See* Perry Aff. Exs. B & D. This evidence was thereafter used to form the charges against Mr. Johnson. Compl. ¶ 8, Doc. No. 1. It is clear that all subsequent

investigation performed in this case was performed as a direct result of the searches and seizures of Mr. Johnson in Aruba and JFK.[2]

## ARGUMENT

**I.    CBP Officers Violated Mr. Johnson's Fourth and Fifth Amendment Rights**

**A.    Legal Standard**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although an individual's expectation of privacy is "less at the border than in the interior," the Fourth Amendment still entitles individuals to "be free from unreasonable search and seizure." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539 (1985). "Warrantless searches and seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Where evidence is obtained as a result of an unlawful search or seizure, it is subject to exclusion. *See generally Wong Sun v. United States*, 371 U.S. 471 (1963). "The exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure

---

[2] To note, there are some discrepancies in the government reports concerning the Aruba Stop and JFK Stop. According to one report, the CBP officers found fourteen phones during the Aruba Stop. *See* Perry Aff. Ex. A. According to another report, the CBP officers found ten phones during the Aruba Stop. *See* Perry Aff. Ex. B. In one report, an electronic exam was performed on one of Mr. Johnson's phones. *See* Perry Aff. Ex. A. In another report, electronic exams were performed on nine of Mr. Johnson's phones. *See* Perry Aff. Ex. B. Lastly, in one report, the Aruba and JFK Stops reportedly occurred on July 28, 2021. *See* Perry Aff. Ex. A. In another report, the Aruba and JFK Stops reportedly occurred the day before, on July 27, 2021. *See* Perry Aff. Ex. B.
While these discrepancies may be explainable, they point to the lack of care exhibited by the officers during the Aruba and JFK Stops and the credibility of the representations made in the government reports insofar as they support the legality of the Aruba and JFK Stops.

and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quotation omitted).

Additionally, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* As *Miranda* requires, the failure to provide this warning results in the suppression of the statements made during the custodial interrogation. *See id.* at 444–45; *United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017).

**B.      Discussion**

CBP officers violated Mr. Johnson's rights under the Fourth Amendment: in Aruba, without a warrant, armed, uniformed agents commanded Mr. Johnson to proceed to a secondary inspection area, where he was not free to leave and where they searched his backpack. Even after determining that Mr. Johnson possessed no contraband, they elected to extend the seizure. During the extended seizure, they read the contents of his papers, interrogated him, and seized the phones and papers for more than a week before returning them. These Fourth Amendment violations require suppression of all evidence procured as a result, including the photographs of the phones, the photocopies of the papers, his alleged statements, and all further evidence intended to be introduced in this case.

It can hardly be contested that Mr. Johnson was detained in Aruba, within the meaning of the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that a person is seized if "in view of all of the circumstances surrounding the incident, a reasonable

person would have believed that he was not free to leave"); *United States v. FNU LNU*, 653 F.3d 144, 154 (2d Cir. 2011) (noting that travelers are not free to leave while being questioned at the border). Likewise, it cannot be contested that Mr. Johnson's belongings were searched. *See United States v. Smith*, 673 F. Supp. 3d 381, 390 (S.D.N.Y. 2023) (describing inspection of items at the border as "searches"). The only Fourth Amendment question for the Court, thus, is whether the searches and seizures in this case fall within an "established and well-delineated exception[]." *Weaver*, 9 F.4th at 138. Specifically at issue in this case is the "border-search" exception. *Smith*, 673 F. Supp. 3d at 390. For the reasons articulated below, the searches and seizures here do not fall within the border-search exception. Moreover, it is clear that all evidence in this case was gathered as a result of this illegal search and seizure, necessitating the suppression of such evidence as fruit of the poisonous tree.

CBP officers also violated Mr. Johnson's Fifth Amendment rights when they subjected him to custodial interrogation while he was in secondary detention without first providing him with *Miranda* warnings. This violation requires his statements to be suppressed for this reason as well.

### 1. The Border Search Exception Did Not Justify the Extensive Search and Extended Seizure of Mr. Johnson and His Property During His Travel from Aruba to New York

Although the border-search exception allows reasonable searches and seizures at the border, the particular searches and seizures in this case—in particular, the reading and photocopying of the property—went beyond the scope of that exception, and violated Mr. Johnson's Fourth Amendment rights for two independent reasons: (a) CBP officers cannot read and photocopy the contents of a traveler's papers and effects without a warrant; (b) even if reasonable suspicion could justify the reading of a traveler's papers and effects, no such reasonable suspicion was present in this case.

a.      **CBP Officers' Reading Personal Papers and Effects at the Border Violates the Fourth Amendment**

The border-search exception to the Fourth Amendment is narrowly constrained to achieve four specific goals: (1) "preventing the introduction into this country of illicit substances or contraband"; (2) "apprehending persons who may pose a threat or who lack authorization to be present in this country"; (3) "inspecting goods to ensure appropriate customs tax is paid," and "more generally" (4) "protecting this Nation from entrants who may bring anything harmful into this country, whether that be communicable diseases, narcotics, or explosives." *Smith*, 673 F. Supp. 3d at 394 (internal citations and quotations omitted). *None* of those purposes justifies the search at issue in this case.

The search of cell phones at the border is analogous to the invasive search at issue in this case. A cell phone is not itself an illicit substance or contraband. The possession of a phone or phones does not bear on the question of whether a person poses a threat or lacks authorization to be in the country. The question of whether customs tax is necessary is apparent from the identification of the object as a cell phone. And beyond taking an x-ray of the phone or perhaps swabbing it for a chemical test, nothing further is needed to determine whether the phone contains narcotics or explosives. For these reasons, Judge Rakoff determined that "[n]one of the rationales supporting the border search exception justifies applying it to searches of digital information contained on a traveler's cell phone." *Smith*, 673 F. Supp. 3d at 394. Because those rationales did not apply, and because of the privacy interests in the data on the phone, Judge Rakoff held that the border-search exception did not apply to searches of such data. *Id.* at 394–96.

The same logic applies to the reading and photocopying of personal papers and effects. For the same reasons stated by *Smith*, none of the rationales behind the border-search exception applies to reading and photocopying papers and effects. Moreover, a person's papers are highly private. It

is for this reason that the Supreme Court noted nearly fifty years ago the "grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects." *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976). Accordingly, the Court instructed that even in searches of papers pursuant to a warrant, "responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy." *Id.* Given the lack of any rationale supporting the border-search exception that could authorize the reading and photocopying of papers and effects, and the "grave dangers" that reading such papers and effects presents, *id.*, the same logic applied in *Smith* necessitates a finding that such conduct is outside the bounds of the border-search exception.

Consequently, by reading and photocopying the papers and effects, CBP officers violated Mr. Johnson's Fourth Amendment rights.

    **b.**  **Even if Reasonable Suspicion Could Support the Reading and Photocopying of Papers and Effects at the Border, No Reasonable Suspicion Existed in This Case**

The Second Circuit has held that reading and photocopying of papers and effects at the border is permissible upon reasonable suspicion possessed *prior to* reading the papers or effects at issue. *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015). But no such reasonable suspicion was present here. The mere fact that multiple phones were found in Mr. Johnson's luggage does not itself give rise to reasonable suspicion. Reasonable suspicion requires the Government to show "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The standard "requires more than a 'hunch.'" *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). As the Sixth Circuit has held, "possessing multiple phones is analytically similar to, for instance, possessing multiple cars: though they can potentially be used in criminal activities, there

are a myriad of legitimate, legal uses as well. So, the fact of possession alone does not give rise to reasonable suspicion." *United States v. Fletcher*, 978 F.3d 1009, 1017 (6th Cir. 2020). Other than the discovery of multiple cell phones, there is no other evidence that could have given rise to reasonable suspicion prior to the officers reading the papers and subsequently interrogating him. Consequently, given the lack of prior reasonable suspicion, the reading and copying of the papers and effects violated Mr. Johnson's Fourth Amendment rights.

### 2.    CBP Officers Unlawfully Extended the Duration of the Border Search in Violation of Mr. Johnson's Fourth Amendment Rights

Once the CBP Officers had performed the lawful portion of their search to achieve the goals as articulated by *Smith*, his continued seizure violated his Fourth Amendment rights. In this regard, *Rodriguez v. United States* is instructive. *See* 575 U.S. 348 (2015). *Rodriguez* concerned the question of whether officers may "extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." *Id.* at 353. The Supreme Court answered in the negative, holding that a traffic stop prolonged beyond the point reasonably required to complete its "mission" is unlawful—and that other actions that prolong a stop, even if taken before the mission of the stop is effectuated, violate the Fourth Amendment. *Id.* at 356–57. In reaching that holding, the Court noted that "[h]ighway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." *Id.* at 357.

Similarly, the justifications underpinning the border-search exception "are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular." The only possible justification in reading Mr. Johnson's papers and effects, subsequently questioning him about them, and then seizing them for 12 days before returning them, was to detect, investigate, and research financial fraud. That is not within the ambit of the border-search exception. *See Smith*, 673 F. Supp. 3d at 396 ("Searches for evidence relating to a

crime (such as the search here) require a warrant, because the Government's interest in obtaining evidence—as opposed to interdicting contraband or other unwanted items or persons—is not materially different at the border than elsewhere."). The searches and seizures in this case violated Mr. Johnson's Fourth Amendment rights for this reason as well.

### 3.    Mr. Johnson's Statements to CBP Officers Were Made in Violation of His Fifth Amendment Right Against Self-Incrimination

The CBP officers violated Mr. Johnson's Fifth Amendment rights. Their questioning was not related to the government's traditional interests at the border but was instead driven by the desire to elicit incriminating information from him relating to financial fraud. Such questions—combined with the lack of freedom associated with a border seizure at a secondary inspection point—triggered the need for a *Miranda* warning, which Mr. Johnson never received. This Fifth Amendment violation requires suppression of his statements during the Aruba Stop, including all statements obtained as a direct result of the violation.

Although he clearly was interrogated during the Aruba Stop, Mr. Johnson was not provided with a *Miranda* warning at any time during its course. As a result, the only possible dispute is whether Mr. Johnson was "in custody" during the interrogation for purposes of *Miranda*. This question focuses on whether "a reasonable person in [Mr. Johnson's] position, who necessarily expects some degree of constraint and questioning [at the border], would consider [himself] to be under arrest." *United States v. Sultanov*, __ F. Supp. 3d __, 2024 WL 3520443, at *30 (E.D.N.Y. 2024). Because "the content of the officer's questions substantially inform[s] whether a reasonable person would feel restrained in a way similar to a formal arrest," the Court must focus on whether the CBP officers' questions "amounted to no more than routine customs and immigration questions" or was "elicited for the purpose of incriminating [him]." *FNU LNU*, 653 F.3d at 150, 154 (quotation omitted).

Here, Mr. Johnson's questioning went outside the normal customs and immigration questions generally asked at the border. There were no immigration questions during the interrogation (unsurprising because Mr. Johnson is an American citizen). *See* Perry Aff. Ex. A. Nor did the officers inquire into whether Mr. Johnson had anything to declare for customs purposes. *See id.* And while the CBP officers were permitted to search Mr. Johnson's backpack, the officers' follow-up questions focused entirely on eliciting information from Mr. Johnson regarding financial fraud. *See id*. This included repeated requests for Mr. Johnson to admit what kind of fraud he was involved in, and increasingly detailed questions about his insurance arrangement, to trick him into confessing to unlawful criminal conduct. *See id.*

Moreover, the fact that the officers pressured Mr. Johnson to open his phones is "the strongest evidence weighing in favor of finding that [Mr. Johnson] was in custody." *United States v. Kamaldoss*, No. 19 Crim. 543, 2022 WL 1200776, at *8 (E.D.N.Y. Apr. 22, 2022). And the officers did not make a one-time request to open his phones: instead, Mr. Johnson was repeatedly pressured to unlock his phones so the officers could conduct an examination of their contents. *See* Perry Aff. Ex. A. In this situation, it is clear that the officers' questioning was driven by a desire to elicit incriminating information from Mr. Johnson. This triggered the need for a *Miranda* warning, which Mr. Johnson was never provided during the Aruba Stop.

Lastly, it is important to emphasize that Mr. Johnson was removed to a "secondary inspection area" during the interrogation, where he was cut off from the other passengers entering the plane. *Id*. The place of the interrogation is relevant in assessing the need for a *Miranda* warning, as the "potentiality for compulsion" increases when an individual is cut off from others. *FNU LNU*, 653 F.3d at 154 (quoting *Miranda*, 384 U.S. at 457). When combined with the nature of Mr. Johnson's questioning—which focused on eliciting responses from Mr. Johnson to incriminate

himself for alleged fraud—and the repeated attempts to pressure Mr. Johnson to open his phones, a reasonable person in Mr. Johnson's position would have considered himself to be under arrest. As a result, the officers were required to provide Mr. Johnson with a *Miranda* warning. *See id*. By failing to do so, Mr. Johnson's Fifth Amendment rights were violated.

## <u>CONCLUSION</u>

For the aforementioned reasons, the Court should suppress (1) Mr. Johnson's statements to the government during the Aruba Stop; (2) the photographs and photocopies made of the evidence seized by the government during the JFK Stop; and (3) all other evidence found in the investigation in this case.


Dated: January 21, 2025          Respectfully submitted,
      New York, New York

                                            */s/ E. Danya Perry*
                                            E. Danya Perry
                                            Joshua Stanton
                                            David Russell
                                            PERRY LAW
                                            445 Park Avenue, 7th Floor
                                            New York, New York 10022
                                            Telephone: (212) 213-3070

                                            *Counsel for Defendant Jason Johnson*